[L. A. No. 1788.    In Bank.—August 10, 1906.]

WILLIAM NEWPORT et al., Appellants, v. TEMESCAL WATER COMPANY, Respondent.

INJUNCTION—WATER DEVELOPED FOR SUPPLY OF TOWN—LARGE EXPEND-ITURE—SLIGHT RESULTING DAMAGE TO LANDOWNERS—SUPPORT OF FINDINGS.—When a water company engaged in the supply of water for public use, had purchased a large acreage in a valley, and pumped water from underlying saturated gravels therein, and had expended nearly a million dollars in collecting and husbanding the water, and delivering it to consumers, and the owners of other lands sought an absolute injunction (without seeking pecuniary com-pensation) to prevent all the acts of the water company, and the court found, upon sufficient evidence, that a plaintiff owning land in another valley had not been injured thereby, and that the plaintiffs having other lands in the same valley had been injured only slightly by the acts of the defendant, the absolute injunction sought was properly refused, and a judgment for the water com-pany must be affirmed.

ID.—INTERESTS OF PUBLIC—DAMAGING OF PRIVATE PROPERTY WITHOUT JUST COMPENSATION—CONDITIONAL INJUNCTION.—Where the inter-ests of the public are involved, and the court can arrive in terms of money at the loss which a plaintiff has sustained, an absolute injunction should not be granted, but only a conditional injunction upon the failure of defendant to make good the damage resulting from the work. In such case the action is not one of condemnation; but the defendant would be held to be in effect damaging private property without just compensation first made to the owner, and, failing to make such compensation, should be enjoined from further damage.

APPEAL from a judgment of the Superior Court of River-side County and from an order denying a new trial. J. S. Noyes, Judge.

The facts are stated in the opinion of the court.

H. C. Rolfe, and C. C. Haskell, for Appellants.

Joseph H. Call, Purington & Adair, and E. W. Freeman, for Respondent.

W. B. Treadwell, *Amicus Curiæ*, also for Respondent.

HENSHAW, J.—Perris Valley is a basin of forty or fifty square miles in extent. The surface soil is of inferior character, arid and alkaline. At a depth varying from eight to forty feet below the surface the land consists of unstratified silt, detritus, and gravels. The voids in this soil carry water, and the water-bearing soils are from one hundred to four hundred feet in depth. Contiguous to Perris Valley is Menefee Valley, a somewhat similar though smaller tract of land. The surface soil of the Menefee Valley is of better quality than that of Perris Valley, and, like the latter, rests on water-bearing gravels. The Temescal Water Company, defendant herein, is a corporation engaged in the collection and distribution of waters for the use of its stockholders and others. It supplies the inhabitants of the town of Corona with water. The town of Corona, with a population of two thousand seven hundred, has grown up dependent upon the water supply of defendant, and property to the value of four million dollars is subject to complete destruction should that supply fail. Of that supply all except an insignificant portion is taken by defendant from Perris Valley. In collecting and husbanding this water and delivering it to its consumers the defendant has expended nearly a million dollars, and the value of its water-rights and other properties is at least two million dollars. In January, 1901, the defendant first purchased one hundred and sixty acres of this water-bearing land in Perris Valley, and from wells then existing, and from additional wells which it bored, pumped water from the underlying saturated gravels and carried it through its flumes and conduits for about forty miles to the lands of its stockholders at Corona. Subsequently, in March, 1903, the defendant purchased three thousand three hundred and forty additional acres of like lands. Thereafter it pumped and conveyed from its lands so

acquired six hundred or more miners' inches during the irrigating season of each year. Upon March 1, 1904, some six landowners in Perris Valley, one of whom, the plaintiff Newport, is also a landowner in the Menefee Valley, brought this action for an absolute injunction to restrain the defendant from further pumping and carrying off the waters of Perris Valley. The essential allegations of their complaint, upon which were founded their demand for an injunction, are that the plane of saturation, when not illegally interfered with, stands from within eight to twenty feet of the surface of the ground; that upon their lands were growing trees, vines, grasses, and shrubbery, sustained by the waters so standing at this level; that by capillarity, percolation, and like natural forces, these waters were drawn toward the surface, moistening and nourishing the roots of herbage and vegetation; that the effect of the pumping of defendant was to lower the plane of saturation so as to render it impossible for the water to reach the roots and thus to destroy these vegetable growths. It was further charged that each of the plaintiffs used, and had used, large quantities of the water for surface irrigation, for the growing of crops, and for the nourishing of vines and trees; that this lowering of the water-plane by defendant made pumping more difficult and expensive and would in time deprive plaintiffs of all water. Finally, it was alleged that Menefee Valley, with Perris Valley, formed a part of one and the same catchment basin, and that the effect of defendant's pumping in Perris Valley was to lower the plane of saturation under plaintiff Newport's land in Menefee Valley, and thus to work the same disastrous result. The defendant answered by denying the alleged acts and the resultant damage. It denied any subterranean connection between the water-bearing gravels of Perris Valley and Menefee Valley, and alleged that these valleys were disconnected and were in different watersheds. As to the lands in Perris Valley, it denied that in a state of nature the saturated gravels in any way contributed to the nourishment of the vegetation, and alleged that the lands were in great part alkaline and unfit for husbandry, and could not produce fair crops either from the sub-surface waters or from surface irrigation or from both. Affirmatively it alleged that underlying the surface of Perris Valley,

and but a few feet below the surface, was a stratum of hard baked clay known as "hardpan," below which stratum lay the saturated gravels, and which stratum prevented the capillary drawing of the waters to any point so near the surface as to aid vegetation; that the effect of this hardpan was to turn the roots of trees, shrubs, and grasses, which could not penetrate through it, giving all vegetation but a shallow and worthless soil in which to endeavor to live; moreover, that when surface irrigation was attempted, by reason of this hardpan, the waters were never returned, and never could return, to the underlying gravels. from which they were taken, but were dissipated and wasted by evaporation. As affirmative defenses the defendant then pleaded its expenditures, the nature of its works, the use to which it had been putting the water, the knowledge and acquiescence of the plaintiffs, and other matters, from which it asked the court to decree that plaintiffs' cause of action was barred by their laches and by estoppel.

After a protracted trial the court found in favor of the defendant upon substantially all the disputed matters. The findings of the court are attacked and some ninety-six specifications are set forth and argued. Plaintiffs' opening brief—three hundred and sixty-six pages in length—is largely devoted to an analysis of and an argument upon the evidence in their endeavor to show that it does not support the findings of the court. The transcript contains about a thousand pages of the evidence. To follow and answer plaintiffs' argument would amount to no more than a setting forth of the evidence which does sustain the findings, and to do this fairly would fill a volume of our reports. It must suffice therefore to say that a critical examination satisfies us that the findings, one and all, are amply supported. But briefly to illustrate the difficulty of discussing the findings within the broadest limits of a judicial opinion, the finding touching Menefee Valley may be instanced. The court found: "That percolating waters in said Menefee tract do not connect with percolating waters in Perris Valley so that the water-level in said Menefee Valley has been or can be affected by pumping water from lands in said Perris Valley." Upon this question a vast deal of evidence was introduced. Upon the part of the plaintiff, **as**

has been said, it was contended that the subterranean connection between the two tracts of land was perfect, that the percolation and filtration were free, and that the direct effect of the pumping of defendant was to lower the water-level in Perris Valley and to cause a corresponding lowering of the level in Menefee. Upon the part of the defendant it was shown that there was a decided ridge and elevation of ground between the two tracts, so that certainly the surface flows of the two were separate and distinct. Government topographical maps were introduced to show that the drainage of the basin of Perris Valley was down the San Jacinto River westerly to Lake Elsinore, while the drainage of the basin of Menefee Valley was distinctly separate and trended southwesterly through Salt Creek. Expert witnesses were likewise called to testify to their belief that there was no subterranean connection between Menefee and Perris valleys and that their subterranean drainage outlets were likewise distinct. Certain of defendant's experts declared their belief in the existence of a more compact earth formation between Menefee and Perris valleys which would effectually prevent and forbid anything like a free seepage or percolation of waters. Defendant, in support of this, urges the existence of dry wells upon this divide,—that is to say, that wells dug upon either side of it in Perris Valley or Menefee Valley carried abundant water, while wells upon this divide yielded very little, and for practical purposes none at all. This in turn was disputed by plaintiffs, who showed that they had sunk wells along the pretended divide, and these wells went into free water-bearing gravels. Defendant again answered this by saying that, conceding this to be so, the wells merely tapped the gravels, that the quantity of water which the wells would produce was not established by this, and still less that it did not establish a water communication between the two valleys; that the nonexistence of this water communication was demonstrated by the fact that the water-level in the wells of Menefee Valley was about six and a half feet higher than the water-level of the wells in Perris Valley before any pumping had taken place; and finally, that it was untenable to argue that Salt Creek, into which Menefee Valley drained, with a grade of forty-eight feet and at a distance of three miles, would not

lower the water-level in the Menefee wells, which remained
standing forty-eight feet above, while lowering the water-
level in Perris Valley ten feet at a distance of five or six
miles, would cause the water-level in the Menefee tract to
lower ten feet. This naked statement of the conflicting
evidence has been given to illustrate the technical nature
of the testimony. When it is considered what astute argu-
ments may and have been raised upon either side in the
analysis of it, it demonstrates the impossibility of attempting
to discuss these arguments in all their varied phases. As
we have said, it must suffice to say that the findings of the
court are well sustained. Those findings were, first, as has
been said, that there was no subterranean connection be-
tween the waters of Perris and Menefee valleys. This find-
ing disposes of the alleged injury to plaintiff Newport's land
in Menefee Valley. The court in turn found the existence
of the layer of hardpan under Perris Valley, the alkaline
nature of the soil, and the natural tendency of surface irriga-
tion to draw this alkali to the top of the ground and thus
destroy vegetation. Specifically it found: "That about
one fourth of the lands of the plaintiff Newport in Perris
Valley, nine tenths of the land of the plaintiff Hoffman, and
about one third of the land of the plaintiff Pierce, are so
impregnated with alkali, or mountainous, as to be rendered
thereby practically unfit for agricultural purposes, and the
remainder of the lands of said plaintiffs in Perris Valley
are adapted to growing grain in seasons of abundant and
seasonable rain, but during average years such land cannot
be profitably farmed, and on account of hardpan, subsoil
and climatic conditions said lands are of little value for
agricultural purposes, and when irrigated, do not produce
profitable crops with reasonable regularity and abundance."
This finding is attacked as being unsupported by the evi-
dence. It is further said that it is too indefinite in its
declaration that the lands have "little value for agricultural
purposes," and that when irrigated do not produce profit-
able crops with "reasonable regularity and abundance."
The evidence showed that of all the lands in Perris Valley
owned by the plaintiffs, which lands aggregate some five
thousand five hundred and ninety acres, and which lands
for the most part have been owned for twenty, fifteen, or

ten years, less than fifty-eight acres were being irrigated by
these plaintiffs. The plaintiff Elisha H. Pierce so irrigated
"thirty-five·acres, more or less," of alfalfa and one acre of
trees and vines and vegetables which could not be grown
without artificial irrigation. The plaintiff William Hoffman
in 1902 irrigated less than one eighth of an acre upon which
were growing a few vegetables and fruit-trees. The plaintiff
Waters for more than five years had been irrigating about
two acres planted to trees, vines, and shrubbery. Plaintiffs
Paggi, who purchased their land after the defendant's
pumping plant was in operation, irrigated one eighth of an
acre of alfalfa and "20 acres more or less" of grapevines;
while the plaintiff Newport never used any of the water in
Perris Valley at all. We do not set forth the small quantity
of the land so irrigated out of the tract of forty or fifty
square miles with any idea that because the use was little
and the value small the defendant and the inhabitants of
Corona which it supplied should in any way receive any
preference, or should for such reason be thought to have
any superior right. Such an argument has no standing in
a court of law and is distinctly repudiated. But the fact
does serve to support the finding of the court that the land
is arid and unprofitable. For it is not to be supposed that
with an abundance of water under the soil, if the soil itself
was fit for cultivation, those waters would not long since
have been used to transform the desert of Perris Valley
into a fruitful garden.

The court further found that in the three years during
which the defendant had pumped water from the valley,
the plane of saturation had lowered some ten feet. But
it distinctly declared against the *post hoc propter hoc* argu-
ment that this lowering was caused by the pumping, and
found that for several years prior to 1901, when the defend-
ant commenced pumping, the long period of drouth that
had existed for the previous ten years, with the pumping
of others than the defendant, had resulted in lowering the
plane of saturation; that defendant's pumping has only
contributed, with these other causes, to the lowering, and
that there was no reason to believe that its continued pump-
ing would in time exhaust the saturation of the water, but
"with normal rainfalls and such as has been usual in the

past forty years in Perris Valley and surrounding country, said water-plane will return to its former level such as it was before any water was pumped therefrom, and will continue to furnish sufficient water for the reasonable use of plaintiffs and defendant without being greatly or permanently lowered." Since the time when defendant commenced to pump in 1901, the finding is that the water-plane has been temporarily reduced an average of about ten feet "part of which reduction has been caused by defendant, the remainder by plaintiffs, by third parties and by natural causes."

These findings so completely dispose of this controversy upon its merits that little is left to be said. It becomes wholly unnecesary to consider the court's finding of laches. Important as the consideration of this question must prove to be where an absolute injunction is sought against work of public or quasi-public character, such discussion must be postponed until the time when it necessarily arises. It is to be observed, however, in this case that the plaintiffs do not ask for damages and an ancillary injunction until such damages are paid, but ask for an injunction absolute, without seeking monetary compensation. But on the question of monetary loss the showing is that the additional cost of pumping caused by the lowering of the water-plane ten feet would be, for alfalfa, the crop requiring the most water, not more than one dollar per acre. So that fifty eight dollars per year would fairly represent the monetary loss of these plaintiffs for all the land which they irrigated, even if the lowering of the plane were wholly attributable to defendant. But, as has been said, the finding of the court establishes that the lowering was due to the use of water by plaintiffs themselves and by others, as well as to the natural cause of drouth, quite as much as to the operations of defendant. And, finally, upon this proposition it may be said that where the interests of the public are involved and the court can arrive in terms of money at the loss which plaintiff has sustained, an absolute injunction should not be granted, but an injunction conditional merely upon the failure of the defendant to make good the damage which results from its work. Such an action, if successful, should be regarded in its nature as the reverse of an action in condemnation. The

defendant in effect would be held to be damaging private property without just compensation first made to the owner, and, failing to make such compensation, should be enjoined from further damage. For, as was said by this court in *Montecito Valley* v. *Santa Barbara,* 144 Cal. 578, [77 Pac. 1113], in a case similar to this, "a prohibitory injunction should only be granted if any and all other forms of relief should be found inadequate." In this case, however, the plaintiffs sought an absolute injunction. This they conceived to be their right under *Katz* v. *Walkinshaw,* 141 Cal. 116, [99 Am. St. Rep. 35, 64 L. R. A. 236, 70 Pac. 663, 74 Pac. 766], which had been decided but two months before the commencement of their action. The decision of *Katz* v. *Walkinshaw* is adhered to, but as plaintiffs on the facts failed to establish any ground for relief under the principles there laid down, no amplification of those principles becomes necessary.

The objections and exceptions to the admission and rejection of evidence taken at the trial do not call for detailed consideration. No one of the rulings adverse to appellants had any bearing upon the findings which we have considered so as in any way to have affected the result, and for the foregoing reasons the judgment and order appealed from are affirmed.

McFarland, J., Shaw, J., Angellotti, J., Lorigan, J., and Sloss, J., concurred.

A rehearing was denied, September 8, 1906, on which Beatty, C. J., delivered the following opinion:—

BEATTY, C. J., dissenting.—In their petition for a rehearing counsel for appellants make a point which I think should have received further consideration before any final disposition of the case. They contend that if they are denied the injunction for which they prayed only because their injury may be fully compensated by money damages, such damages should have been allowed in this suit under their prayer for general relief, and that it was error, in view of the admitted fact that their lands are permanently damaged by the same unlawful acts which were enjoined in

*Katz* v. *Walkinshaw,* 141 Cal. 116, [99 Am. St. Rep. 35, 64 L. R. A. 236, 70 Pac. 663, 74 Pac. 766], to turn them out of a court of equity without any relief and with a judgment against them for all the costs of a protracted litigation. The argument advanced in support of this proposition seems to me very cogent, and deserving of the further and serious consideration of the court, and for this reason I dissent from the order denying a rehearing.